IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| McGowan Investors LP, et al., | : | |
| PLAINTIFFS, | : | |
| | : | |
| | : | CIVIL ACTION |
| v. | : | No:  06-2558 |
| | : | |
| | : | |
| Meyer S. Frucher, et al., | : | |
| DEFENDANTS | : | |

March 31, 2007                                                      Brody, Anita J.

## OPINION

The Philadelphia Stock Exchange (PHLX, or "the Exchange") converted from a mutual organization into a private stock corporation in a process called demutualization. Plaintiffs are former seat owners of the mutual Philadelphia Stock Exchange who became shareholders in the corporation after demutualization.  They bring this securities fraud class action for equitable relief and money damages under rule 10b-5 and section 29(b) of the Securities Exchange Act.  Defendants are current and past members of the PHLX Board of Governors (the PHLX Defendants)[1], and the six institutional investors that

---

[1] The PHLX management defendants are: Frucher (CEO and Board Chair); Steisel (PHLX senior management).  The PHLX Board member defendants are:  Benton, Bigelow, Cantwell, Carroll, Carter, Curcio, Dandridge, Erichsen, Fowler, Hunt, Juneman, Kennedy, Myers, O'Rourke, Papadakis, Pizzi, Pressler, Sklar, Sperling, Stallkamp, Wallace, White, and Yetman.

eventually acquired around 89% of the stock in the demutualized Exchange (the Strategic Investors).[2]

Plaintiffs mainly contend in their Amended Complaint that demutualization and the investment by the Strategic Investors decreased the value of their ownership  interests in the PHLX, and that defendants fraudulently engineered this result for their own enrichment.  The PHLX Defendants and the Strategic Investors filed separate motions to dismiss.  I grant those motions in their entirety and dismiss the case with prejudice without leave to amend.

I.      Introduction[3]

Prior to demutualization, 100 percent of the ownership of the Exchange was made up of 505 individual "seats."  The seats could be sold or rented for revenue.  In order to access the Exchange, a trader needed to rent or own one of the seats.   In November 2003, the seat owners voted to demutualize and convert the private, mutually owned Exchange into a private Delaware stock corporation.  Each seat became 100 shares, which are transferable on a private market.  When demutualization took effect in January 2004, the new corporation authorized 1,000,000 shares of stock. 50,500 were issued to the former seat owners and the rest were reserved.   In the spring of 2005, the Exchange Board approved an executive stock compensation plan of 5,050 shares.  That summer, the defendant Strategic Investors made a deal with the Exchange to acquire an approximate 89 percent stake  in the Exchange.  Part of the equity was acquired immediately with cash, and the remainder consisted of warrants tied to the Strategic Investors' bringing a

---

[2] The Strategic Investor defendants are:  Citadel Derivatives Group, Citigroup Financial Products, Credit Suisse First Boston; Merrill Lynch, Morgan Stanley, and UBS Securities.
[3] The facts in the Introduction are not contested.

certain level of options trading business to the Exchange over a period of time.   The Exchange Board rejected offers from two other investors, Archipelago and Timber Hill.

Plaintiffs filed this securities fraud class action against the PHLX Defendants and the Strategic Investors.   Defendants moved to dismiss, arguing that plaintiffs could not show standing under 10b-5 because they were not buyers or sellers of securities, and that they had not properly pled the elements of a securities fraud claim.   Plaintiffs responded to the motions to dismiss by arguing that they were actually proceeding under section 29(b) based on an underlying 10b-5 violation, and so they did not need to meet all the requirements for an independent 10b-5 action.   After oral argument, I ordered the parties to provide supplemental briefing on the section 29(b) issues.   The plaintiffs also submitted additional briefing on their own motions.

II.    Amended Complaint

The Amended Complaint gives the following account of events:

The defendants defrauded the seat owners of their pre-demutualization 100% interest in the Exchange by diluting their shares in the demutualized corporation through the stock sales to the Strategic Investor defendants.   The scheme originated with defendant Frucher, Exchange CEO and Board Chair in 2000, when he began to artificially drive down the value of a seat by imposing a three-year-long monthly $1500 "capital tax" on all seat owners.   In 2002, Frucher and the other PHLX defendants began to develop the proposal for demutualization, which would require a majority vote of seat owners.   They falsely argued structural change was necessary for the Exchange's

economic future.  Demutualization would allow the Exchange to use stock to create strategic alliances and draw in investors.

During the campaign to demutualize, Frucher and the Board deceived the seat owners into thinking that their interests would be best served by demutualization.  They lied by assuring the plaintiffs that as shareholders, they would be protected from excessive dilution and that they would get to vote on any major equity sales.  They also lied by saying that management was not seeking to obtain equity in the Exchange for itself.  As additional ammunition, Frucher threatened to reimpose the seat "tax"---which expired in 2003 during the lead-up to the vote on demutualization---if the seat owners did not approve demutualization.  Frucher falsely depicted the seat tax as necessary to economically support the Exchange.  In 2004, as a result of these misrepresentations, the seat owners voted to demutualize.

But the whole time Frucher and the other PHLX defendants were touting demutualization as beneficial to the seat owners, they were in fact secretly planning to strip the plaintiffs of their equity and take it for themselves.  This was accomplished by selling a huge stake in the Exchange to the Strategic Investors at low prices, without the promised vote by the former seat owners (now shareholders), and then trying to eliminate the former seat owners through a fraudulent stock buy-back ("the Tender Offer").  Frucher and the other defendants used deliberately fuzzy math to justify their deal with the Strategic Investors and make it appear to be in the Exchange and the shareholders' best interests.  They rejected other deals on the table that would have been more favorable to the plaintiffs and the Exchange in favor of a collusive deal with the Strategic

Investors.  Frucher and the Board were motivated to increase their compensation, reap

the gains of a planned IPO, and maintain their positions in the Exchange management.

The Strategic Investors were motivated by the extremely advantageous deal they

were getting:  approximately 89 percent of the Exchange for much less than its true

value.  Plus, the requirements to exercise the warrants were mostly illusory, since they

would have brought that level of options trading to the Exchange anyway.  They would

also reap the benefits of an IPO.

In the end, the seat owners, who had once owned 100% of the Exchange, were

left with owning less than 10% of the Exchange and a smaller amount of the Exchange's

equity per share than they had before demutualization, and less than they would have had

if the more advantageous deals had been accepted by the Board.


III.    Jurisdiction and Motion to Dismiss Standard

I have jurisdiction under 28 U.S.C. § 1331.   On a 12(b)(6)  motion to dismiss, the

court must accept plaintiffs' well-pleaded factual allegations as true, but is not compelled

to accept "unsupported conclusions and unwarranted inferences." *Schuylkill Energy Res.,*

*Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.1997).


IV.    Claims Reached

Plaintiffs have adopted shifting positions throughout the course of this litigation

about the claim they seek to assert:  section 29(b), which allows a contract to be voided

if it violates rule 10b-5 in formation or performance; or an independent private money

damages claim for a rule 10b-5 violation; or both. The issue is of some importance,

5

since a plaintiff asserting an independent 10b-5 claim must plead additional elements (buyer/seller standing, loss, and reliance) not required of a 29(b) plaintiff pleading a subordinate 10b-5 violation.

The Amended Complaint gave every indication that the plaintiffs were proceeding solely under rule 10b-5 for damages. *See, e.g.,* Am. Cmplt. at ¶ 69, 120. Section 29(b) is not mentioned anywhere, and so with good reason the defendants addressed their Motions to Dismiss solely to the apparent 10b-5 claim. But in their Opposition to the Motions to Dismiss, the plaintiffs revealed that they were bringing section 29(b) claim based on a 10b-5 violation, not an independent 10b-5 claim:

> [B]oth sets of defendants addressed the wrong claim and therefore have set out an incorrect legal analysis of what must be pled; Plaintiffs are proceeding under Section 29(b) for rescission whereas the defendants set up and then attack a claim for money damages under Section 10b.

Opp. at 3.

At oral argument and in their subsequent briefing, plaintiffs seemed to change course again and assert both a 29(b) claim and an independent 10b-5 claim. Tr. at 80 (Oct. 5, 2006); Pltff. Supp. Mem. at 1.

In light of the shifting sands of this litigation, I will address both the section 29(b) claim based on a 10b-5 violation, and the independent 10b-5 claim. The Amended Complaint certainly did not put defendants on notice that they were facing a 29(b) claim, but they had ample opportunity to respond to it in the supplemental briefing. At the same time, plaintiffs may not now disown what was plainly an independent 10b-5 claim in their Amended Complaint.

Plaintiffs' vacillations give me reason enough to dismiss this case with prejudice without reaching the merits of either claim at all. They failed to plead their 29(b) claim,

and they plainly dropped their independent 10b-5 claim in their Opposition.  But I most likely would have granted plaintiffs leave to amend the complaint to add the 29(b) claim had they requested it.  Defendants have argued that the 29(b) claim was barred by the statute of limitations at the time it was raised in the Opposition, but had plaintiffs amended their complaint, the 29(b) claim would have related back to the date of the original complaint, which was filed before the limitations period ended.

I realize that this procedural posture is not entirely satisfying, but reaching the merits of both claims serves the interests of fairness, efficiency, and finality for the court and both parties.   And in the end, whether I address the independent 10b-5 claim or only the 29(b) claim with its subordinate 10b-5 violation is largely academic, since I reach dispositive elements of any sort of 10b-5 claim in order to resolve the 29(b) claim.


IV.     Elements of Rule 10b-5 and 29(b) Claims.

A.      Independent 10b-5 Claim

Section 10(b) of the Securities Exchange Act prohibits the "use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).  Rule 10b-5, which implements section 10(b), forbids "mak[ing] any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.  Section 10(b) and rule 10b-5 together create a private right of action.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005).

Elements of an independent 10b-5 claim are material misrepresentation or omission in connection with the purpose or sale of a security; scienter; reliance; loss; and causation. *Id.* at 341-342. For standing, a 10b-5 plaintiff must be herself a buyer or seller of securities. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 749 (1975).

An independent 10b-5 complaint must meet the strict heightened pleading requirements set out in Fed.R.Civ.Pro. 9(b) and the Private Securities Litigation Reform Act ("Reform Act"), 15 U.S.C. § 78u-4(b). Under rule 9(b), the circumstances surrounding the fraud must be "stated with particularity." The Reform Act imposes a further hurdle for establishing scienter and misrepresentation. For scienter, the plaintiff seeking money damages[4] must show

> proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). In the Third Circuit,

> plaintiffs plead scienter by alleging [with particularity] facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior . . . catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.

*In re Advanta,* 180 F.3d 525, 534-35 (3d Cir. 1999).[5]

To plead misrepresentation, the complaint must identify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15

---

[4] Plaintiffs seek both rescission and money damages.

[5] The Supreme Court is currently considering the scope of 10b-5 scienter and the Reform Act pleading requirement. *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 127 S.Ct. 853 (2007) (Mem) (granting certiorari). However, the result in this case would be the same under any of the scienter standards used by the Circuits.

U.S.C. § 78u-4(b)(1).   The misrepresentation or omission must be material, such that a "reasonable shareholder would consider it important in deciding how to vote." *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449 (1976); *In re Burlington Coat Factory Securities Litigation*, 114 F.3d 1410, 1435 (3d Cir. 1997).   Although materiality is often a question of fact, it is a question of law "when the disclosures or omissions are so clearly unimportant that reasonable minds could not differ."  *GFL Advantage Fund, Ltd. v. Colkitt,* 272 F.3d 189, 213 (3d Cir. 2001).

    B.  Subordinate 10b-5 Violation within a Section 29(b) Claim

    Plaintiffs' 29(b) claim is based on a subordinate violation of 10b-5.  Section 29(b) of the Securities Exchange Act provides an additional, but much less frequently used, avenue for private securities fraud actions.  Under 29(b), "Every contract made in violation of a provision of this chapter or any rule or regulation thereunder . . . or the performance of which involves [such] violation . . . shall be void."  15 U.S.C. §78cc(b).  Plaintiffs invoking 29(b) must establish that the contract they seek to void involved or will involve an underlying violation of securities law, and they must also show that they are parties to the contract or in privity with a party to the contract.  *Berckeley Investment Group v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006).  "Section 29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions."  *Id.*

    In contrast to an independent 10b-5 claim, 29(b) plaintiffs with a subordinate 10b-5 claim need not be buyers or sellers of securities themselves; instead, they need only be party to a contract that violates (in its performance or formation) any provision of the

Securities Exchange Act. *Id.* at 208. Further, unlike an independent 10b-5 plaintiff, a 29(b) plaintiff claiming a subordinate 10b-5 violation need not show loss causation or reliance. *Id.* But to prove the subordinate 10b-5 violation, the 29(b) plaintiff must still show material misrepresentation and scienter. *Id.* As with an independent action under 10b-5, misrepresentation and scienter in a subordinate 10b-5 claim are subject to Fed.R.Civ.Pro. 9(b) and the Reform Act's heightened pleading requirements. *Id.* at 209 n.18 (analyzing independent and subordinate independent 10b-5 misrepresentation and scienter elements under the same heightened standard).

V .     All Defendants:  Section 29(b) Privity Inadequately Pleaded

To assert a 29(b) claim to rescind a contract, the plaintiff must be a party to a contract or in privity with a party to a contract that violates security law. *Berckeley*, 455 F.3d at 205. In their responsive briefs, plaintiffs argue that the "contract" is comprised of all the transactions identified on the Amended Complaint: the demutualization, the deal with the Strategic Investors, and the Tender Offer. They contend that the PHLX defendants are their agents, giving plaintiffs the necessary privity with respect to all of the three transactions. This principle-agent relationship was allegedly formed when the plaintiffs "entrusted the disposition of their equity interests" to the PHLX defendants during demutualization and attempted to retain control over those interests through voting rights in any capital investments. Pltff. Sur Reply at 6.

Plaintiffs fail to plead privity because the Amended Complaint does not support the sine qua non of a principle-agent relationship: that the plaintiffs had the right to control the PHLX defendants, and that the defendants consented Restatement (Third) of

Agency § 1.01.   Plaintiffs argue that they "attempted to retain control" over their equity by making efforts to retain voting rights to approve any equity sales.  But they cannot point to any facts to substantiate that they attempted to retain control, other than February 2003 and January 2005 memorandums from Frucher to the PHLX community stating that any significant equity investment would "require Board, shareholder and SEC action, at a minimum."  Am. Cmplt. ¶ 67f, 67k.  But these informal memos, which plaintiffs themselves characterize as only a "promise of a vote," are insufficient to show that plaintiffs controlled the PHLX defendants.  They do not express an agency relationship of consent and control.  Agency would have to be established by other facts not pleaded in this complaint.

Plaintiffs also argue that privity can be established via "deeming the PHLX board an instrumentality of the six investors" or "piercing the corporate veil."  Sur Reply at 5.  Plaintiffs seem to be suggesting that the court use its equitable powers to disregard the 29(b) privity requirement.  That would be inappropriate in light of binding precedent and the language of the statute.


VI.     All Defendants:  Independent and Subordinate 10b-5 Violations     Inadequately Pleaded

Plaintiffs make an independent 10b-5 claim, and a subordinate 10b-5 claim as the violation underlying their 29(b) claim.  For both the independent and subordinate 10b-5 violations, plaintiffs must prove the common elements of material misrepresentation and

scienter.  As such, misrepresentation and scienter are analyzed together in the section below for both the independent and subordinate 10b-5 violations.[6]

Plaintiffs need not demonstrate loss and reliance for the subordinate 10b-5 violation, but they must do so for the independent 10b-5 violation.  However, in this case, the core misrepresentation  --- that demutualization was engineered to steal plaintiffs' interests in the Exchange --- is inextricably linked to financial loss.  Having pleaded that defendants stole their equity, they must also plead that they lost something.[7]

A.      PHLX Defendants:  Misrepresentation

A misrepresentation is a misstatement of a material fact.  Plaintiff's claims of misrepresentation against the PHLX Defendants are predicated upon a February 2003 memorandum from Frucher as the plan for demutualization was developing, an October 2003 Information Memorandum from the PHLX Defendants leading up to the vote and a January 2005 memorandum from Frucher issued after the vote.

1.      Theft of Plaintiffs' Equity

Plaintiffs' central allegation is that demutualization was a plot against them to strip them of their equity via dilution, and that the PHLX defendants engineered the equity deal with the Strategic Investors to accomplish this goal.  All the parties agree that the PHLX defendants always disclosed that one central purpose of demutualization was to create stock that would facilitate strategic investments in the Exchange, and that the inevitable result of any such capital investments would be that the former seat owners

---

[6] For the independent 10b-5 claim, plaintiffs must also show they are the buyers or sellers of a security.  For the subordinate 10b-5 violation, plaintiffs might not need to be buyers or sellers of securities themselves, but at a minimum they must establish that the violation involved the purchase or sale of a security.  Because I find that plaintiffs have not pleaded misrepresentation or scienter, I do not reach the buyer/seller or purchase/sale elements of either the independent or subordinate 10b-5 violations.

[7] In this context, "loss" is not necessarily identical to the separate loss element that must be pleaded in the independent 10b-5 claim, which I do not reach.

would own less than 100 percent of the Exchange.  In the lead-up to the vote on demutualization, the PHLX defendants provided an extensive Information Memorandum in support of demutualization that stated that:

> It is highly unlikely that we would find a third party investment desirable if it were at a price that would dilute the value of the Owners' per share equity . . . The Board of Governors will consider with great care matters of valuation and dilution.  Obviously, if one or more outside investors contributes equity capital, the Owners will then own less than 100 percent, but that percentage would represent a slice of an economically "larger" Exchange as a result of the capital infusion.

Am. Cmplt. at ¶ 77; PHLX Init. Mem., Ex. D (citing Info. Memo at 15).[8]  Under the heading of "Risk Factors," the Information Memorandum also stated more bluntly that demutualization would mean that "the holders of the common stock [i.e., the former seat owners] would not be able to prevent dilution of their ownership in the Phlx."  PHLX Init. Mem. Ex. D. (citing Info. Memo. at 27).  With this information in hand, the seat owners voted to approve demutualization.

Through various calculations and documents, plaintiffs claim that in fact, the deal with the Strategic Investors diluted the former seat-owners' interests far below the Information Memorandum's promises of a "slice of an economically 'larger' Exchange." In this light, plaintiffs emphasize that the seat-owners' per-share equity was decreased by the deal with Strategic Investors, contrary to the promises made by the Board in the Information Memorandum and by Frucher in separate communications.   Am. Cmplt. at ¶¶ 77, 79, 99.  However, plaintiffs never mention the current market value of their shares in calculating their loss.  Instead, they rely on numbers taken from PHLX annual reports, which do not reflect market value, but rather represent only book value -- the income and

---

[8] ¶ 77 of the Amended Complaint incorrectly cites to page 11 of the Info. Memo.

liabilities for the year.  Am. Cmplt. at ¶¶ 68a-b; 99.[9]  But book value cannot alone

indicate the value of a stock for the purposes of the Amended Complaint's central

allegation: that the defendants lied when they assured plaintiffs that they would end up

with a "slice of an economically 'larger' Exchange."  *See, e.g., Borg v. Int'l Silver Co.*,

11 F.2d 147, 152 (2d Cir. 1925) (Hand, J.) ("The suggestion that the book value of the

shares is any measure of their actual value is clearly fallacious...value is nothing more

than what people will pay for the shares."); *Schaffer v. Below*, 278 F.2d 619, 625 (3d Cir.

1960) (Book value "does not reflect either the current market value of the stock or the

current market value of the assets of the corporation unless those values are reflected on

the books.")

　　　Plaintiffs hew to their theory that they were lied to because they now own a

smaller amount of the Exchange's book value than they did before demutualization.

Opp. at 15-16.[10]  But book value alone provides insufficient basis to determine whether

the PHLX defendants' lied about what the plaintiffs' ownership interests would be under

demutualization.  For the same reasons, the Amended Complaint does not provide factual

support to determine whether the Tender Offer and the deal with the Strategic Investors

constituted a "theft."

　　　This is not to say that market value alone would provide the answer about

whether the defendants lied about dilution.   What the defendants meant by "a slice of an

---

[9] The Amended Complaint takes its numbers from the "annual financial reports of the PHLX that are posted on the PHLX web site."  ¶ 68a.  The reports are not appended to the Amended Complaint but can be incorporated by reference.  An examination of the reports demonstrates that the figures used by plaintiffs refer only to book value of the PHLX mutual and corporation, not the market value of PHLX shares. *See, e.g.* 1997 Annual Report at http://www.phlx.com/pub/annualreports/PHLX97.pdf at 6-7 (pre-demutualization);  2005 Annual Report at http://www.phlx.com/pub/annualreports/PHLX05.pdf at 12 (post-demutualization).

[10] Plaintiffs do mention that the stock price has increased 700%.  Opp. at 7.  But they resolutely reject considering that increase as relevant to their case, except to suggest that such an increase serves as further evidence of wrongdoing.  *Id.*

economically 'larger' Exchange," and whether the subsequent transactions accomplished that result, is ultimately a question of fact.  However, the truthfulness of defendants' representations about value cannot be determined *solely* on the basis of book value and without *any* consideration of market value, as plaintiffs insist.  Opp. at. 7.  Thus, plaintiffs have failed to properly plead the core misrepresentation of their claim:  that the PHLX defendants and the Strategic Investors stole their equity.  All of the other allegations in the Amended Complaint tied to the value of plaintiffs' current ownership interests must likewise be rejected as insufficiently pleaded.[11]

2.      Voting Rights

Plaintiffs allege that the PHLX defendants lied about the seat owners' right to vote on equity sales in order to induce them into voting to demutualize.  In a memorandum dated from February 2003 on the demutualization proposal being developed, Frucher addressed concerns about "the ability for vote on any prospective strategic alliances."  Am. Cmpt. at ¶ 67f.  He wrote that "Although counsel will need to weigh in on the specifics, the new shareholders of the Phlx . . . will have the type of shareholders' rights that are vested in any other stock corporation, rights which provide a mechanism for voting on specific major corporate events."  *Id.*  In October 2003, the Board issued the formal Information Memorandum containing the finalized proposal for demutualization.  The Information Memorandum specified that shareholders would *not*

---

[11] These include the allegations that Frucher manipulated the seat price to make it seem like demutualization was the only economically feasible option, when his real plan was to use demutualization to strip plaintiffs of their equity, ¶¶ 74-77; that the warrant requirement in the deal with the Strategic Investors was illusory, ¶¶ 101-102; that the Strategic Investors got a deal too good to be legal, ¶ 99(b), 103; that the Timber Hill and Archipelago offers, other offers,  were fraudulently rejected, even though they would have been better for plaintiffs, and that plaintiffs were lied to about why these deals were rejected, ¶¶ 90, 93; and that process, structure and calculations used to reach the deal with the Strategic Investors were fraudulent, ¶¶ 96-101.  These allegations also fail on their own to properly identify actionable misrepresentations even when not tied to the valuation claim.

have voting rights over equity transactions that could dilute their ownership.  PHLX Init.
Mem. Ex. D. (citing Info. Mem. at 27) ("[A]dditional shares of common stock . . . could
be issued . . . without a vote of the holders of the common stock.")  The next month, the
seat owners approved the demutualization.  Then in January 2005, in response to rumors
that the Exchange had been bought, Frucher wrote that the Exchange had not "made a
deal to be acquired," and that any "significant equity investment" would require "Board,
shareholder, and SEC action, at minimum."  Am. Cmplt. at ¶67k.   As it turned out, the
shareholders did not get to vote on the Summer 2005 investment deals with the Strategic
Investors, or on any of the other offers on the table.

Plaintiffs argue that the fact that they did not get to vote on the Summer 2005
deals demonstrates that the assurances of voting rights made before and after
demutualization were misrepresentations that misled them into approving
demutualization.  But when considered in the context of all the information available to
the plaintiffs at the time they approved demutualization, the representations about voting
rights do not rise to the level of material misrepresentations.  *See In re Donald J. Trump
Casino Securities Litigation-Taj Mahal Litigation*, 7 F.3d 357, 364 (3d Cir. 1993)
(discussing the "well-established principle that a statement or omission must be
considered in context, so that accompanying statements may render it immaterial as a
matter of law").  The February 2003 Frucher memorandum left open some question about
the scope of voting rights, but it also states that "counsel will need to weigh in on the
specifics."  But later, the Information Memorandum unmistakably clarifies that
transactions exactly of the type at issue in this case would not be subject to a shareholder
vote.

A misrepresentation is only material if a reasonable investor would have been misled. *TSC Indus.,* 426 U.S. at 449.   It would have been unreasonable for a seat owner to rely on the vague, initial statements about voting rights in the short February 2003 memorandum over the comprehensive, final, and precise statements in the Information Memorandum.  Finally, the January 2005 memorandum from Frucher does not state anything contrary to the Information Memorandum; instead, it refers to voting rights related to a merger or acquisition, which is not at issue here.  And because the January 2005 memorandum was issued after the seat owners approved demutualization, it  could not have been material to their decision.

3.     Stock Compensation

Plaintiffs contend the PHLX defendants lied about using demutualization as an ends to enrich themselves by awards of stock compensation.  In his February 2003 memorandum issued prior to the demutualization vote, Frucher stated that the intent of demutualization was not to "carve out an equity stake" for management.  Am. Cmplt. at ¶ 67f.  The October 2003 Information Memorandum specified that the proposed by-laws of the corporation would permit the Board to authorize stock compensation of less than 10% of outstanding common stock without a shareholder vote.  Am. Cmplt. at ¶ 81 (citing Info. Memo. at 99).  When demutualization was approved, those by-laws took effect.  The Board then authorized a stock compensation plan without a shareholder vote, consistent with the by-laws and Information Memorandum.  Am. Cmplt.at ¶67o.  Plaintiff characterizes this sequence of events as reneging on an initial promise not to "carve out" equity for management.  Am. Cmplt. at ¶81.  The term "carve-out" used in the February 2003 Frucher memo is at best ambiguous.  Given the clear statement

authorizing the stock plan in the Information Memorandum, Frucher's earlier statement about "carve-outs" is not a material misrepresentation.  *TSC Indus.,* 426 U.S. at 449.

### 4.    Tender Offer

Plaintiffs also make various claims about the Tender Offer made to shareholders after the deal with the Archipelago company was rejected.  Am. Cmplt. at ¶¶ 106-110. According to plaintiffs', the Tender Offer was "the final step in eliminating significant numbers of the Class A shareholders [i.e., the former seat owners]."  Opp. at 21.  The only way the Tender Offer (which none of the plaintiffs accepted) fits into the plaintiffs' complaint is as support to show animus towards and misrepresentation to the former seat-owners in connection to the attempt to steal their equity.  Because the Amended Complaint does not state a claim about that misrepresentation, neither can the claims about the Tender Offer survive.

### 5.    Miscellaneous

Finally, plaintiffs make miscellaneous charges of wrongdoing: that Frucher and other management received improper loans and excessive compensation that was not properly disclosed, ¶ 68d-i; that Frucher and senior management concealed certain aspects of Delaware law during the campaign to demutualize and misrepresented the value of appraisal rights, ¶ 78; that Frucher plotted to retained improper regulatory control of the Exchange, ¶ 82; and that Frucher sought to deter litigation against the Exchange, ¶ 83.  These allegations are unsupported by sufficient factual pleadings.

B.    PHLX Defendants: Scienter

Scienter is basically a wrongful state of mind.

1.    Board Defendants

The Amended Complaint names twenty-five PHLX defendants.  Twenty-three are current or past PHLX Board members, one (Steisel) is PHLX senior management, and one (Frucher) has dual roles.

The Amended Complaint fails to make any specific allegations against any PHLX defendant apart from Frucher, and, nominally, Steisel.  The remaining allegations are all generically directed to "senior management and the Board."  The claimed liability of the twenty-three Board defendants rests on their presence at four meetings where decisions were made about the deal with the Strategic Investors and the tender offer, ¶¶ 116, 117, 118, 119; the Information Memorandum issued by the Board in advance of demutualization,  ¶ 67g; and other documents they issued.  The Amended Complaint also discusses the activities of a Board subcommittee formed to analyze the various investment deals in 2005.  ¶¶ 67n, 91-100.

Plaintiff's theory is that scienter for the twenty-three PHLX Board defendants can be shown by the fact that they rejected more favorable investment proposals and structures, and instead opted for a deal that "resulted in a lower realization" for plaintiffs. Opp. 25.  Plaintiffs argue that scienter can also be inferred from the Board's acceptance of inconsistent valuations of the PHLX in preparing for the deal with the Strategic Investors.  *Id.*   Finally, they argue that the Board approved the Tender Offer, which constituted knowledge that the deal with the Strategic Investors would constitute a loss of equity based on book value of the corporation.  *Id.*

19

These generalized allegations against the 23 Board defendants are insufficient to show the requisite "strong inference" of scienter required under the Reform Act. Scienter can be shown "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Suprema Specialties,* 438 F.3d at 276. Recklessness includes "[h]ighly unreasonable (conduct), involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.*

Plaintiffs seem to argue that the twenty-three Board defendants had the motive and opportunity to commit fraud by virtue of their role as Board members. However, plaintiffs fail to explain exactly what their motive would have been, apart from suggesting that they might eventually become eligible for lucrative stock compensation. But allegations of motive based only on the defendant's position and desire for increased compensation are insufficient. *In re Alpharma Inc. Securities Litigation*, 372 F.3d 137, 152-53 (3d Cir. 2004). If motive and opportunity could be established simply by pleading that corporate boards and executives want increased compensation and have access to the means to increase their compensation, then every single corporate manager or board member in the United States would have the requisite scienter. *Id.*

Plaintiffs also fail to make the required specific allegations against each defendant. "Permitting blanket assertions of motive and opportunity to serve as a basis for liability under the Exchange Act would undermine the more rigorous pleading

standard Congress has established." *In re Advanta,* 180 F.3d at 535.  Blanket allegations

against groups of defendants are insufficient.  *In re Suprema,* 438 F.3d at 281-83.  Nor

may scienter be shown simply by suggesting that a defendant by virtue of her position

"must have known" about fraud.  *Id.*

Plaintiffs also seem to suggest that the twenty-three Board defendants' scienter

can be inferred from circumstantial evidence, namely, that they approved such massively

disadvantageous investments over other, better investments that they must have intended

to commit fraud.  But because the Amended Complaint provides no basis for determining

whether the demutualization and the subsequent transactions actually created any losses

for the plaintiffs, there is no way to evaluate this allegation.

2. Steisel

Defendant Steisel is the only individual other than Frucher to whom the Amended

Complaint individually attributes a fraudulent act:  that he "was, upon information and

believe, the associate of defendant Frucher who was in charge of filling in the details for

the deal making."  Am. Cmplt. at ¶ 113.  Under the Reform Act, allegations of

misrepresentations based on information and belief must be "state[d] with particularity

all facts on which that belief is formed."  15 U.S.C. 78-u4(b)(1).  No such facts are

specified about Steisel's acts, so the claims against him are not adequately pleaded.

3. Frucher

The Amended Complaint makes numerous individual allegations of scienter

against Frucher.  They fall into two groups:  that Frucher was motivated by personal gain;

and that the frauds were so outrageous on their face that Frucher must have had scienter.

Am. Cmplt. at ¶ 90 (the Archipelago deal was rejected because Frucher wished to retain

his management position); ¶¶ 80-81, 94-95 (Frucher's goal in the deal with the Strategic

Investors was an eventual IPO to get the Exchange's equity for himself).  Both categories

of scienter are inadequately pleaded.  Allegations of personal gain alone are insufficient

to show scienter.  *In re Alpharma*,  372 F.3d at 152 -153; *GSC Partners CDO Fund v.*

*Washington*, 368 F.3d 228, 237 -238 (3rd Cir. 2004).  And because the Amended

Complaint fails to show the outrageousness of the deals with the Strategic Investors, they

cannot be used as circumstantial evidence to show that Frucher must have intended fraud.

Further, allegations that a defendant "must have known" about a fraud based on his

executive position are inadequate.  *In re Advanta,* 180 F.3d at 539.


    C.    Strategic Investors:  Misrepresentation and Scienter

    Plaintiffs' theory is that the Strategic Investors are liable as control persons under

section 20(a) or as primary violators of 10(b).  Plaintiffs argue that the obvious "theft"

involved in the deal means that the Strategic Investors were involved in the entire scheme

and intended to defraud the seat owners.  Am. Cmplt.  at ¶¶ 122, 123.  But the Amended

Complaint identifies no specific misrepresentations or omissions made by the Strategic

Investors where they had a duty to disclose.  And for the same reasons that the

misrepresentation in the deal with the Strategic Investors was not properly pleaded with

respect to the PHLX defendants, it was not properly pleaded with respect to the Strategic

Investors.

    Plaintiffs also fail to plead scienter for the Strategic Defendants.  The Amended

Complaint contains no direct facts to support scienter, but instead suggests that it can be

inferred by the unfairness of the deal the Strategic Defendants made with the Exchange.

Am. Cmplt. at ¶ 122, 123.  Again, since this "theft" cannot be supported by the Amended

Complaint, it cannot be used to infer scienter.  Nor do plaintiffs make any more than

generalized group allegations against the Strategic Investors which, as a matter of law,

Plaintiffs do not contest that they treat the Strategic Investors "as a unit," but instead

merely offer that "one should not be obligated to ple[a]d what cannot be pled."  Opp. at

23.  But pleading as a unit, without more, does not satisfy the scienter requirement.  *In re

Suprema Specialties,* 438 F.3d at 282-83.   Finally, that the Strategic Investors stood to

gain by the transaction cannot show scienter.  *GSC Partners CDO Fund,* 368 F.3d at 237-

238.


VI.     Conclusion

        Plaintiffs' section 29(b) and rule 10b-5 claim fail as a matter of law because they

have not adequately pleaded privity, material misrepresentation, or scienter.  The case is

accordingly dismissed with prejudice.  Because plaintiffs have had ample opportunity to

litigate their securities fraud claims and provide no reason to believe that they could

fruitfully add anything to their case, I will not grant leave to amend.